FILED
JAN 14 2022

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DESI DUNCAN CAMPBELL,<br><br>Defendant. | 1:17-CR-10033-CBK<br><br><br><br>**MEMORANDUM AND ORDER** |

## I. BACKGROUND

Defendant Desi D. Campbell ("defendant") has moved this Court to reduce his term of imprisonment pursuant to 18 U.S.C. § 3582(c). Doc. 79. The United States responded on January 3, 2022, in opposition to Mr. Campbell's motion. Doc. 82. Unlike most motions for compassionate release, Mr. Campbell does not request an immediate release from his incarceration at Federal Correctional Institute ("FCI") Sandstone in Minnesota. Rather, he asks this Court for a reduction from the end of his sentence by 21 months, because that is the length of time his imprisonment has been affected by the COVID-19 pandemic. Mr. Campbell's anticipated release date is scheduled for August 20, 2024. So instead of being released immediately, he asks this Court for a release in approximately November 2022.

The defendant pled guilty to Abusive Sexual Contact, 18 U.S.C. §§ 1153, 2244(a)(1), 2246(3), for his years-long molestation of his former partner's young daughter, J.R.A. J.R.A. was approximately seven or eight-years-old when the sexual abuse began, which lasted for around four to five years, with instances of molestation occurring up to several times a week. Mr. Campbell was not held to account for these acts of abuse until years later, when the victim was 20-years-old. In 2018, this Court

sentenced Mr. Campbell to a term of imprisonment of 84 months, markedly below his advisory guideline range of 120 months, the statutorily authorized maximum,[1] followed by a term of supervised release of five years.

No doubt, COVID-19 is a severe public health crisis that has upended our federal prison system, and the nation more broadly. But because none of the reasons offered by the defendant approach an extraordinary and compelling circumstance, nor do the factors listed under 18 U.S.C. § 3553(a) lean in favor of an early release, Mr. Campbell's motion for a reduction in term of imprisonment should be denied.

## II. DISCUSSION

### A. Legal Standard

The Sentencing Reform Act of 1984, Pub. L. 98-473, Title II, § 212, authorized, *inter alia*, the district court, upon motion of the Director of the BOP, to reduce a prison term after considering the factors set forth in 18 U.S.C. § 3553(a), "if it finds that extraordinary and compelling reasons warrant such a reduction and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The United States Sentencing Commission was established by the Sentencing Reform Act, Pub. L. 98-473, Title II, §217(a), codified at 18 U.S.C. § 3582(c)(1)(A). Effective November 1, 2006, the Sentencing Commission adopted Guideline §1B1.13, the policy statement on reduction of a term of imprisonment pursuant to § 3582(c)(1)(A). These provisions are known as the compassionate release provisions of the federal criminal code and the Federal Sentencing Guidelines.

On December 21, 2018, the First Step Act of 2018 was enacted. Pub. L. 115-391. The First Step Act amended, *inter alia*, § 3582(c)(1)(A) to increase the use and transparency of the compassionate release process. Pub. L. 115-391, § 603(b). The Act added district court authority to grant compassionate release upon motion of a defendant after the exhaustion of administrative remedies. The Federal Sentencing Guidelines have

---

[1] Mr. Campbell's original advisory guideline range was 235–293 months, but was adjusted to the statutory maximum of 120 months.

2

not been amended since passage of the First Step Act in 2018.[2] This Court proceeds in three steps: (1) assessing whether Campbell has exhausted his administrative remedies, (2) determining whether defendant has "demonstrated that there are extraordinary and compelling circumstances warranting early release," and (3) if he has demonstrated such circumstances, "whether the 18 U.S.C. § 3553(a) factors weigh in favor of early release." United States v. Ramos, 2021 WL 4507464, at *4 (N.D. Iowa Oct. 1, 2021).

## B. Jurisdiction

Since sentences are final judgments, a court ordinarily "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, an exception exists where a court "may reduce the term of imprisonment" when "extraordinary and compelling reasons" exist and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." Id. § 3582(c)(1)(A)(i). Further, the 18 U.S.C. § 3553(a) factors must support a reduction. Id. The defendant carries the burden to show a sentence reduction is warranted under 18 U.S.C. § 3582(c). United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016).

## C. Administrative Exhaustion

This Court can only grant a sentence reduction upon motion of the defendant "after [he] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons ("BOP") to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). While the (outdated) Federal Sentencing Guidelines only provide for district courts to consider motions for sentence reduction on request by the BOP, this Court has previously explained why the First Step Act grants courts the authority to hear such motions made by the defendant himself. See United States v.

---

[2] The Commission lost its quorum in January 2019, stopping any progress in the Commission's work these past three years. See United States v. Rodd, 966 F.3d 740, 746 n.7 (8th Cir. 2020) ("'As the Sentencing Commission lacks a quorum to amend the U.S. Sentencing Guidelines, it seems unlikely there will be a policy statement applicable to [compassionate-release] motions brought by defendants in the near future.'") (alteration in original) (quoting United States v. Beck, 425 F.Supp.3d 573, 579 n.7 (M.D.N.C. 2019)). The Court hopes the other branches of the federal government will soon resolve this long lapse in a quorum, inhibiting the Commission from pursuing much-needed work.

3

Spotted Horse, 2020 WL 4932808, at *2–3 (D.S.D. Aug. 24, 2020). Here, Mr. Campbell requested a Reduction in Sentence ("RIS") to the BOP, which was received on June 11, 2021. Doc. 79-1. On October 28, 2021, Warden J. Fikes denied the defendant's RIS, thus ripening Campbell's motion before this Court upon the exhaustion of administrative remedies. Id.

### D. Extraordinary and Compelling

Compassionate release offers defendants with "extraordinary and compelling reasons" the opportunity to leave prison prior to the conclusion of their sentence. 18 U.S.C. § 3582(c)(1)(A)(i). However, § 3582(c)(1)(A)(i) does not define what "extraordinary and compelling reasons" may be; rather, that was left to the Commission. And as this Court has noted, the Commission has failed to offer such explanations to date. Prior to the First Step Act, however, the Commission established four categories for district courts to consider when reducing a defendant's term of imprisonment; pursuant to U.S.S.G. §1B1.13, Application Note 1, four examples of extraordinary and compelling reasons for compassionate release are:

(A) Medical Condition of the Defendant. —
    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
    (ii) The defendant is—
        (I) suffering from a serious physical or medical condition,
        (II) suffering from a serious functional or cognitive impairment, or
        (III) experiencing deteriorating physical or mental health because of the aging process,
    that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
(B) Age of the Defendant. — The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
(C) Family Circumstances.

> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons. — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The United States Court of Appeals for the Eighth Circuit has not yet decided whether the district court is bound by the Sentencing Commission's policy statement when considering a compassionate release motion under the First Step Act amendment to § 3582(c)(1)(A). "While some courts adhere to the pre-First Step Act policy statements, other courts have ruled that the pre-First Step Act policy statements are inapplicable, and that a judge has discretion to determine, at least until the Sentencing Commission acts, what qualifies as extraordinary and compelling reasons." United States v. Rodd, 966 F.3d 740, 745 (8th Cir. 2020) (cleaned up). In both Eighth Circuit cases that have addressed compassionate release since the adoption of the First Step Act, the Eighth Circuit declined to address the issue because, whether or not § 1B1.13 applies, the Eighth Circuit held that the district court in both cases considered the § 3553(a) factors and determined that, even assuming the First Step Act envisioned a more expansive definition of ordinary and compelling reasons than set forth in § 1B1.13, compassionate release was not warranted in those instances. Rodd, 966 F.3d at 745–46; United States v. Loggins, 966 F.3d 891, 892–93 (8th Cir. 2020).

Chief Judge Lange has held that the "discretion given to the Director of the BOP in § 1B1.13 comment note 1(D), also allows federal judges to consider 'extraordinary and compelling reason[s] other than' those specifically described." United States v. Dillabaugh, 2020 WL 3402392, at *3 (D.S.D. June 19, 2020). In other words, district courts are not limited by § 1B1.13, even if it applies to post First Step Act motions for compassionate release. Reading what is "extraordinary and compelling" beyond the strict confines authored by the Commission comports with the purpose of the Act, which as this Court has previously noted, "was to expand the availability of compassionate release

5

based on judicial findings of extraordinary and compelling reasons *without being restricted* to those categories identified by the Sentencing Commission or the rationale used by the BOP before the passage of the First Step Act." United States v. Shangreaux, 2021 WL 1611500, at *3 (D.S.D. April 26, 2021) (emphasis added). Because the Commission has not yet updated relevant factors for district courts to consider, they "need not conform" to the factors listed above. United States v. McCoy, 981 F.3d 271, 283 (4th Cir. 2020).

Defendant requests compassionate release based upon his medical condition and the fact that COVID 19 is wide-spread in the BOP system. Chief Judge Lange has observed:

> There can be no doubt that the effects of the global COVID-19 pandemic are extraordinary, and that the disease in some situations may be an "other reason" to grant compassionate release under § 1B1.13 comment note (D). The illness and the potential for its spread has affected the daily life of nearly every American citizen and has resulted in massive disruptions to the economy. Despite these drastic effects, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." The question becomes whether [defendant's] medical conditions . . . combined with the crowded conditions of confinement justify compassionate release.

United States v. Frost, 2020 WL 3869294, at *4 (D.S.D. July 9, 2020) (cleaned up).

### E. Analysis

Mr. Campbell raises five factors that he asserts rise to the high bar of extraordinary and compelling circumstances for an early release. However, as the Court has previously explained, Campbell is not requesting an *immediate* release, but rather 21 months cut from the end of his sentence, in approximately November 2022. The defendant's arguments are: (1) lack of fresh air and exercise; (2) lack of rehabilitative programming; (3) inhumane housing; (4) inability to attend to spiritual needs; and (5) no visitation. Doc. 79 at 4–6. Each will be addressed in turn.

1. *Lack of Fresh Air and Exercise*

First, defendant Campbell argues he is entitled to an early release because he is receiving an average of "less than 90 minutes of outdoor exercise per week." Id. at 4. He asserts this raises "serious Constitutional questions, in addition to constituting an extraordinary and compelling reason." Id. Campbell cites to the Ninth Circuit Court of Appeals' decision in Hearns v. Terhune, 413 F.3d 1036 (9th Cir. 2005), for the assertion that exercise is a basic human necessity within the context of the Eighth Amendment to the United States Constitution. However, in Hearns, the prisoner was not able to go into the prison yard for nine months due to high heat, lack of drinkable water, as opposed to here where the defendant still could go outside for an hour and a half a week. Hearns, 413 F.3d at 1042–43. Further, the Hearns Court explicitly declined answering whether the lack of going outside to the yard for nine months would in fact constitute an independent basis for an unconstitutional living condition. Id. at 1043. This Court will consider these concerns alongside the rest of Campbell's arguments.

Within the Eighth Amendment context, a "'lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened.'" Hosna v. Groose, 80 F.3d 298, 306 (8th Cir. 1996) (*quoting* Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992)). However, "[t]o prevail," Campbell must show that the prison officials "'were deliberately indifferent to his exercise needs.'" Id. (*quoting* Wishon, 978 F.2d at 448–49). Further, the Eighth Circuit has previously held that prisoners who were permitted only 45 minutes of exercise a week when in protective custody were not unconstitutionally deprived of their opportunity to be outside. Wishon, 978 F.2d at 449.

This motion is not the proper vehicle for Campbell to raise constitutional challenges to his confinement. Rather, the defendant would need to bring a civil action pursuant to Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971). Nevertheless, case law from this circuit makes bare the high threshold required for a showing of prison staff unconstitutionally depriving inmates of exercise time outside. Tossing aside any requirement of a showing of deliberate indifference on the part of the FCI Sandstone

7

staff, Campbell's arguments still fall flat. Considering the global pandemic upending lives across the United States and world, Mr. Campbell was nevertheless still able to average twice the amount of time outside than deemed constitutionally permissible by the Eighth Circuit in Wishon v. Gammon, and six times longer than what a prisoner received *every other week* for outside recreation by a sister District Court. See Wishon, 978 F.2d. at 449; Altman v. Loggins, 2008 WL 3539513 at *9 (W.D. Ark. Aug. 11, 2008). This factor does not approach the demanding threshold for a showing of extraordinary and compelling circumstances.

### 2. *Lack of Rehabilitative Programming*

Next, Mr. Campbell argues, briefly and in broad strokes, that FCI Sandstone lacks rehabilitative programming, failing to explain substantively what in fact is missing. Rather, the defendant summarily asserts he "participated in productive activities" without explaining what these activities were, whether they were cancelled because of the pandemic, or any other cognizable information for this Court to analyze. Doc. 79 at 5. Because this is a mere threadbare recitation without a specific basis, the Court proceeds to Campbell's next argument.

### 3. *Inhumane Housing*

Third, defendant Campbell claims he was subjected to inhumane dormitory style housing which resulted in him contracting COVID-19. Id. It is unquestioned that prisons can be a hotbed for infection during the pandemic. See generally THE COVID PRISON PROJECT, https://covidprisonproject.com/data/national-overview/. But wisely, Mr. Campbell has received two doses of the COVID-19 Moderna vaccine.

Regardless, the COVID-19 rates where Campbell would return if released are grim and pose serious risk of transmission. In his pre-sentence investigation interview, the defendant stated he "plans to continue residing in Summit, [South Dakota]" once released. Doc. 66 at 9. Summit is inside the Lake Traverse Reservation in Roberts County, in northeastern South Dakota. Roberts County's total population is approximately 10,280. SOUTH DAKOTA: 2020 CENSUS, https://www.census.gov/library/stories/state-by-state/south-dakota-population-change-

8

between-census-decade.html. As of December 30, 2021, Roberts County has 71 active cases, with a weekly polymerase chain reaction ("PCR") test positivity rate of 19.4%, labelling it a county of high community spread per the South Dakota Department of Health.[3] SOUTH DAKOTA COVID-19 DASHBOARD, https://doh.sd.gov/COVID/Dashboard.aspx (last visited Dec. 30, 2021). To reach a hospital from Summit, the defendant must either drive 25 miles west to Sanford Webster Medical Center, or similar distances north to reach the Indian Health Service's Woodrow Wilson Keeble Memorial Health Care Center or Coteau Health Care System Hospital, both in Sisseton. As of December 29, 2021, there is only one FCI Sandstone inmate currently infected with COVID-19, and no staff infections, out of a prison population of 962. COVID-19 Cases, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 30, 2021).

While COVID-19 certainly constitutes an unprecedented public health risk, the unfortunate reality is that defendant's risk of reinfection at FCI Sandstone has not been shown to be any higher than his risk of contracting the virus while residing in Summit, a town 30 minutes from a hospital and inside a county of high transmission rates. This Court has previously lamented the oftentimes lacking and substandard access to needed medical care on South Dakota's reservations.[4] Because of these systemic inadequacies,

---

[3] Out of South Dakota's 66 counties, all but four are currently labelled with "high" or "substantial" community spread. Eric Mayer, *COVID-19 in South Dakota: 809 Total new Cases; Death Toll Rises to 2,486; Active Cases at 8,323*, KELOLAND, Dec. 30, 2021, https://www.keloland.com/news/healthbeat/coronavirus/covid-19-in-south-dakota-809-total-new-cases-death-toll-rises-to-2486-active-cases-at-8323/.

[4] The Indian Health Service readily admits that "[t]he American Indian and Alaska Native people have long experienced lower health status when compared with other Americans. Lower life expectancy and the disproportionate disease burden exist perhaps because of inadequate education, disproportionate poverty, and discrimination in the delivery of health services, and cultural differences. These are broad quality of life issues rooted in economic adversity and poor social conditions." DISPARITIES, INDIAN HEALTH SERV., https://www.ihs.gov/newsroom/factsheets/disparities/ (last visited Dec. 30, 2021). Buoyed by "decades-long underfunding" these rural communities often lack seasoned medical personnel, or personnel at all." Mary Smith, *Native Americans: A Crisis in Health Equity*, HUMAN RIGHTS MAGAZINE, AM. BAR ASSOC., Aug. 1, 2018 https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/the-state-of-healthcare-in-the-united-states/native-american-crisis-in-health-equity/. The national secretary of the American Bar Association and a former principal deputy director of the Indian Health Service has cited to the national Congress of American Indians' analysis that "to match the level of care provided to federal prisoners (for Native Americans on reservations), funding would have to nearly double," while also noting that "[f]unding would need to be even higher to match the benefits guaranteed by programs such as Medicaid." Id.

the defendant's access to healthcare on a reservation in South Dakota is far inferior to that of a Federal Bureau of Prisons facility, including FCI Sandstone.

### 4. *Inability to Attend to Spiritual Needs*

At three sentences void of meaningful claims, Campbell fails to make a modicum of an argument asserting an inability to have his spiritual needs met. The defendant does not explain what services he has previously taken advantage of, what specific services he is currently not able to attend due to FCI Sandstone COVID-related policies, or other indicia to this argument. Further, like his inhumane conditions claim, this argument is more appropriate for a Bivens civil action than a motion for compassionate release.

### 5. *No Visitation*

Lastly, Campbell rightly points to the lack of visitation services currently being offered at Sandstone. Certainly, it is lamentable that the defendant cannot embrace his son and daughter, whom he has not seen in nearly two years. However, this factor alone cannot warrant an extraordinary and compelling circumstance to justify an early release, a release the defendant is not even asking for at this moment but rather later in the future.

### 6. *Claims Asserted do not Rise to High Bar of Extraordinary and Compelling*

The defendant's arguments fall markedly short of the high bar for extraordinary and compelling circumstances. Some of Campbell's arguments do not squarely fit within the applicable analysis for compassionate release, while the others are not adequately briefed or do not justify release. And again, vexingly, Campbell is not even asking for immediate release, but rather to have 21 months cut from the end of his sentence, with an anticipated adjusted release date of late 2022.[5] Nor does Campbell assert he has any of the increased risk factors for severe illness from COVID-19. See *People with Certain Medical Conditions*, COVID-19, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 14, 2021). This Court cannot peer into the future and assume what the living conditions at FCI Sandstone will be like come

---

[5] Although Campbell "would accept the Court's granting of immediate release," his motion instead centers on a release later in compensation for the difficult conditions imposed from the pandemic. Doc. 79 at 7.

10

November, prior to Mr. Campbell's release, and whether the arguments listed in his motion would even be applicable at that later date. Accordingly, the defendant has not met his burden. The Court nevertheless proceeds to analyze whether the factors listed in 18 U.S.C. § 3553(a) weigh in favor of granting compassionate release.

### F. 18 U.S.C. § 3553(a) Factors

I have considered all the § 3553(a) factors, just as I did during Campbell's original 2018 sentencing. These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the need to reflect the seriousness of the offense, afford adequate deterrence, promote respect for the law, provide just punishment, deter criminal conduct and protect the public from further crimes of the defendant, among others. 18 U.S.C. § 3553(a)(1)–(7).

#### 1. *Nature and Circumstances of the Offense*

Mr. Campbell mercilessly sexually abused the victim, J.R.A., beginning when she was around 7 or 8-years-old. The defendant's brazen abuse was not a one-off event; rather, his transgressions occurred several times a week, for approximately the next four to five years. The defendant moved in with J.R.A.'s mother, Ms. Jaime Lee, in Agency Village, South Dakota, in approximately 2001, when the victim was around five-years-old. Campbell cohabitated with J.R.A., her mother, and her brother through 2007 when the relationship with the victim's mother ended due to the defendant's infidelity. J.R.A.'s mother worked at the Dakota Sioux Casino near Watertown, South Dakota, often at nights. Thus, Mr. Campbell would be tasked with getting Ms. Lee's children to bed. Instead of ensuring J.R.A. had a safe home, he molested her several times a week, for years on end.

The sexual abuse began when J.R.A. was around seven or eight-years-old. When recalling the first time, J.R.A. remembers the defendant laying down next to her and touching her body in inappropriate ways. He would place his hands on her breasts and nipples, grabbing and rubbing them in a sexual manner. The defendant kissed the young girl's breast and nipples, touching her vagina with his hand. Next, the defendant removed J.R.A.'s clothes, and removing his own as well so that he was naked from the

waist down. Campbell then put J.R.A. on top of him, rubbing his erect penis on her vagina. During this abuse, Campbell penetrated J.R.A.'s labia majora and minor. Once finished, Campbell left the room without saying a word.

With nobody to hear her cries for help, J.R.A. remained silent, frozen in fear and confusion. Feeling humiliated, J.R.A. did not want to talk to anyone about the horrid acts wrought upon her by the defendant. Tragically, this abuse would continue and worsen.

At later instances of abuse, J.R.A. reported the defendant would make clear he wanted her to give him oral sex. He would push her face and head down towards his exposed penis, which she would resist. The young girl endured Campbell touching his penis to her face and lips.

Disastrously for J.R.A., the abuse did not end when Campbell moved out in 2007. J.R.A.'s mother continued an amicable relationship with Campbell, a relationship he exploited by volunteering to babysit her children whenever needed. This offer was repeatedly taken up by Ms. Lee, leaving J.R.A. alone for further exploitation and molestation.[6]

J.R.A. was 20-years-old when she disclosed her longstanding trauma, meaning the defendant had free range and no impediment for many years following his repeated molestation of the young girl. It would be an understatement to say the nature and circumstances of this offense were horrid and undeniably tragic.

2. *History and Characteristics of Defendant Campbell*

The defendant has only a limited criminal history, comprised of a 2011 conviction for Theft by Insufficient Funds Check in Watertown. He also successfully finished high school in Waubay, South Dakota. While Campbell enrolled at Sisseton-Wahpeton College in Agency Village, he did not ultimately receive a degree for his studies. Finally, Mr. Campbell was gainfully employed in Webster from 2014 until this proceeding as a scale tech/general laborer, even receiving "Employee of the Year" for the scale division

---

[6] While the defendant initially objected to the facts reported in the pre-sentence investigation, he subsequently withdrew all his objections. Doc. 73.

in 2018. The Court is properly taking into consideration the defendant's personal history and characteristics.

### 3. *Remaining § 3553(a) Factors*

Considering the remaining § 3553(a) factors, including the need to reflect the seriousness of the offense, afford adequate deterrence, promote respect for the law, provide just punishment, and deter criminal conduct and protect from further crimes of the defendant, among others, all factors lean against early release. Mr. Campbell's years-long sexual abuse of J.R.A. lasted for approximately four to five years, buttressed by many years of him remaining free from consequences. In order to afford adequate deterrence for such misconduct, as well as to promote respect for the law, § 3553(a) demands this Court turn away from an early release. Further, the defendant already received a reprieve from his guideline sentence. With a total offense level of 38, and a criminal history category of I, Mr. Campbell's original guideline imprisonment range was 235–293 months. But, with a statutorily authorized maximum of 10 years, the advisory range was reduced to 120 months. Ultimately, this Court sentenced Mr. Campbell below this adjusted guideline range to a term of 84 months, followed by a period of supervised release of five years. This original sentence provides just punishment in this matter, while deterring further criminal conduct and protecting the public from further crimes of the defendant. Accordingly, the defendant's motion should be denied.

### III.   CONCLUSION

Mr. Campbell has already received a term of imprisonment 26 months below his adjusted advisory guideline range. He has failed to present to this Court extraordinary and compelling circumstances to warrant an early release from his confinement. Additionally, the factors listed under 18 U.S.C. § 3553(a) lean against compassionate release. The defendant does not even ask this Court for an immediate release, like most motions for compassionate release. Rather, he requests a 21month reduction from the end of his sentence because of the harsh conditions allegedly wrought upon him at FCI Sandstone during the pandemic. All his reasons are unavailing. Mr. Campbell remained free from consequence for years following his countless bouts of molesting J.R.A.,

robbing her of the childhood she deserved. Because of the reasons explained above, Mr. Desi Campbell's motion to reduce term of imprisonment should be denied.

IT IS HEREBY ORDERED that defendant Desi D. Campbell's motion to reduce term of imprisonment, doc. 79, is denied.

DATED this 10th day of January, 2022

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge